# 𝔚𝔶𝔱𝔥𝔢𝔳𝔦𝔩𝔩𝔢.

## WARD v. WHITE.

### JUNE 20, 1889.

1. EVIDENCE—*Res gestæ—Assault and battery—Mitigation—Case at bar.*—In action for assault,and battery, evidence that plaintiff had on the day before the assault took place published of defendant a gross insult, causing the assault, *held,* admissible as part of the *res gestæ* and in mitigation of damages.

2. DAMAGES—*Jury—New trial.*—In actions for personal torts, and actions generally sounding in damages, it is the province of the jury to estimate the injury, and the court will not interfere, unless there be a manifest abuse.

Error to judgment of circuit court of Washington county rendered January 20, 1888, in an action wherein George W. Ward was plaintiff, and William W. White and others were defendants, to recover damages for a personal assault and shooting of plaintiff in error by defendants in error in the town of Abingdon, September 27, 1885. On the trial the verdict was for the plaintiff, and damages assessed against the defendant for the sum of thirteen hundred and seventy-five dollars, and judgment rendered by the court accordingly. The plaintiff took sundry bills of exception at the trial, and after the verdict was rendered in his favor for the sum stated, he was dissatisfied with the amount, his action being for twenty-five thousand dollars damages, and moved the court to set aside the same and grant him a new trial, which motion the court overruled and certified the evidence; whereupon the case was brought to this court by writ of error.

*F. S. Blair* and *T. N. Williams*, for the plaintiff in error.

*C. F. Trigg* and *J. A. Walker*, for the defendants in error.

LACY, J., delivered the opinion of the court.

This is a writ of error to a judgment of the circuit court of Washington county rendered on the 20th day of January, 1888. The action was trespass for a personal assault, made by the defendants in error upon the plaintiff in error, shooting him down in the town of Abingdon on the 27th day of September, 1885.

On the trial the verdict was for the plaintiff, and damages assessed against the defendants for the sum of thirteen hundred and seventy-five dollars, and judgment rendered by the court accordingly.

The plaintiff took sundry bills of exception at the trial, and after the verdict was rendered in his favor for the sum stated, he was dissatisfied with the amount, his action being for twenty-five thousand dollars damages, and moved the court to set aside the same and grant him a new trial, which motion the court overruled and certified the evidence, whereupon the case was brought to this court by writ of error.

The evidence, so far as we deem it necessary to be stated, is as follows:

Ward, the plaintiff in error, and plaintiff in the court below, was the editor of a newspaper in the town of Abingdon, which had a general circulation throughout the state of about one thousand. In the issue of that paper which appeared on the 26th day of September, 1885, the following appeared, referring to the defendant, William White, the party who did the shooting:

"The man that goes into a convention, and seeks the support of a convention, and then runs, without any valid reason,

against the nominee of the convention, would steal the coppers off the eyes of a dead negro."

Also:

" We propose first to ask these questions, namely: William White. Why was he caucussing with the enemies of democracy at Wristner's warehouse; and how a man can honorably seek the nomination of the democratic party, and because he didn't get it, become a traitor," &c., &c.

Before the issue in question appeared, Ward absented himself on business, and was detained by severed railroad connection so that he did not reach home until the day after the said publication.

It was proved that before the publication in question, Ward had threatened to attack White's private character, and been warned that if he did White would shoot him, and he had boasted with an oath that he was no coward. White was an independent candidate for the senate, and had thus incurred the enmity of some of his fellow-men. When the publication was made, people called White's attention to these insulting comments upon him, and he became furiously angry, and showed such violence of excitement as to make it evident that a conflict would occur when the two men met. But Ward was absent, as has been stated, and only returned the next day. Upon the train Ward was warned that White was looking for him, and he opened his valise and transferred therefrom a revolver to his pocket. Riding up from the depot in the hotel omnibus, Ward passed White coming down on the sidewalk in an excited way, going toward the depot. White turned and followed the omnibus, which, however, left him and went on to the hotel, and Ward alighted without injury and went to his room, got his dinner, armed himself with another pistol, so that he had one in his hip pocket and one in his coat pocket. After moving about, going to his office and coming back, he retired to his room and laid down on the bed, and then came

out on the street in the afternoon, and saw one of the defendants, N. Gooch and White sitting on the hotel porch, who got up and left as Ward came out, in a suspicious sort of way, but Ward looking up and down the street to see if the course was clear, walked over to a drug store and bought a cigar, and chatted awhile with the druggist, who was his friend, about fifteen minutes, and then walked along the street back to his hotel smoking a cigar, holding that in one hand and his cane in the other hand; but just before he reached the hotel, without warning, he was shot down, and falling, rolled over on his back, and saw across the street William White, gun in hand, on the curbstone, looking, as the evidence states, like one of the characters in Dante's Inferno. Ward was badly shot, but he crawled to the porch and pulled himself up and over by the bannisters into shooting position, as he says, and opened fire on Graham White, standing behind a tree. While Ward was crawling along to the porch, White shot at him again, but his aim was impaired by some one seizing the gun, and Ward was not again struck, although he and Graham White exchanged several shots. Ward was very badly hurt, and for many months languished of wounds which were thought very dangerous and likely to result most unfavorably. But he got well, and none of the unfavorable results followed.

The first exception taken, and the first assignment of error here, is that the court admitted in evidence the newspaper articles mentioned above.

It is insisted by the counsel for the plaintiff in error that the newspaper insults were too remote to have had any effect on the matter; that White had a whole day, and more, to get cool in, and that the articles could neither have been admitted in evidence correctly, as matter in mitigation of damages, nor as part of the *res gestæ*, but should have been excluded altogether.

On the other side, it is insisted that they were properly admitted in evidence in mitigation of damages, and also as

part of the res gestæ—and we are cited to the case of Davis v. Franke (33 Gratt., p. 416), decided in this court in 1880.

In that case Staples, judge, says: "The authorities are generally agreed that in an action of trespass for an assault and battery, the defendant may, under the general issue, give in evidence matters which go mainly to the *question* of damages by palliating the offense. When the defendant relies upon provocation, it must be so recent as to raise the presumption that the assault was committed in heat of blood excited by the conduct or declarations of the plaintiff. The rule which confines the defendant to proof of recent provocations received from the plaintiff, is subject to modifications which more or less qualify the rule according to the particular circumstances of each case."

Lord Abinger said, in *Fraser* v. *Berkely* (32 E. C. L. R., 558): "The law would be an unwise law if it did not make allowance for human infirmities; and if a person commit violence at a time when he is smarting under immediate provocation, that is mitigation. * * * It appears to me too severe to say, you should not look at the cause which induced the assault."

Judge Staples also says, in the case of *Davis* v. *Franke, supra*, concerning the res gestæ : "It has been justly said that the affairs of men consist of a complication of circumstances so intimately interwoven as to be hardly separable from each other. Each owes its birth to some preceding circumstance, and in its turn becomes the prolific parent of others; and each, during its existence, has its inseparable attributes and its kindred facts, materially affecting its character, and essential to be known in order to a right understanding of its nature. These surrounding circumstances, constituting a part of the res gestæ, may always be shown to the jury in connection with the principal fact," citing Mr. Justice Parke as saying, in *Rawson* v. *Haigh* (2 Bing. R., 104): "It was impossible to tie down to time the rule as to declarations."

The area of events covered by the term res gestæ depends

upon the circumstances of each particular case. (Whar. Ev., 258.) When a business man, coolly and disengagedly, completes half a dozen distinct negotiations in the course of an hour, the sweep taken by the *res gestæ* in each case is limited to what is done in the time of the particular negotiation. (*Wiles* v. *Knott*, 12 Gill. and I., 442.) When, however, one man of high parts and great energy is employed in a single protracted negotiation of great importance, then we can conceive of his whole time for weeks being absorbed in the negotiation, and of its so tinging with its characteristics everything that he does and says, that for all this period the things that he does and says become rather the incidents of the negotiation than of himself. (*Fifield* v. *Richardson*, 34 Va., 410; *Cunningham* v. *Parks*, 97 Mass., 172; *Muscoigne* v. *Rodd*, 34 Ga., 33.)

So, if in one of our streets there is an unexpected collision between men, entire strangers to each other, then the *res gestæ* of the collision are confined within the few minutes that it occupied. When, again, there is a social feud in which two religious factions are arrayed against each other for weeks, and so much absorbed in the collision as to be conscious of little else, then all that such parties do and say under such circumstances is as much a part of the *res gestæ* as the blows given in the homicides for which particular prosecutions may be brought. (Whar. Ev., sec. 259, *Com.* v. *Sherry* and *Com.* v. *Daley*, reported in the appendix to Wharton on Homicide. *Rex* v. *Gordon*, 21 How., St. Tr., 542.)

The *res gestæ* may be, therefore, defined as those circumstances which are the undesigned incidents of a particular litigated act, and which are admissible when illustrative of such act. (*Nutting* v. *Page*, 4 Gray, 584.)

These incidents may be separated from the act by a lapse of time more or less appreciable. They must stand in *immediate causal relation* to the act; a relation not broken by the interposition of voluntary individual wariness, seeking to manufacture

evidence for itself. Incidents that are thus immediately and unconsciously associated with an act, whether such incidents are doings or declarations, become in this way evidence of the character of the act. And Lord Denman in *Ridley* v. *Gyde*, 9 Binh., 349, approving the saying of Baron Parke, above cited, "that it is impossible to tie down to time the declarations that may be made part of the *res gestæ*," said: "That if there be connecting circumstances, a declaration may even at a month's interval form part of the whole *res gestæ*." And Mr. Wharton says upon the authority of numerous cases: "Therefore, declarations which are the immediate accompaniments of an act are admissible as part of the *res gestæ*, remembering that *immediateness is tested by closeness not of time but by causal relation*." And what is done is part of the *res gestæ*, as much as what is said.

Mr. Field, in his admirable work on the law of damages, says: "In actions for wilful injuries to the person, when vindictive damages are claimed, the defendant should not be restricted, in proving matters which took place at the very time of the injury complained of. But he has a right to show the jury the true relations of the parties, and any facts and circumstances relating to the act, in order that they may determine how far it was wanton, malicious, vindictive, or unprovoked, or how far extenuated by the conduct, declarations, or provocations of the plaintiff." *Prentiss* v. *Shaw*, 56 Me., 427, cited approvingly in *Davis* v. *Franke*, *supra*.

Upon the foregoing principles, we think the admission in evidence by the court of the newspaper articles, was plainly right. They were the direct cause of the assault complained of; without them, therefore, there would have been no assault committed. To have exhibited the defendant to the jury in the attitude of a wanton assassin, without cause, or provocation, shooting down a fellow man, who was guiltless of injury or offense toward him, would have been a mockery of justice. How far these stinging insults mitigated the evil of the attack

in question was a matter for the jury to determine, but there can be no doubt, *there can be no denial!* that the insulting words stood close to the act in question, in immediate causal relation thereto, and thus constituted part of the *res gestæ,* and as such are admissible in evidence. But they were also admissible in mitigation of damages; they *caused* the assault, *provoked* it, were of a character to greatly excite and inflame the passions of the defendant, and while the time extended itself through the period during which the whereabouts of the plaintiff were unknown, the subsequent meeting brought the whole matter vividly before the mind, and again ignited the passions of a man thus put under the ban of a newspaper insult, which was at the very time of the assault under the eyes of thousands of his fellow men, and which tended toward his utter degradation. He was taunted with the matter on every hand, and so far from cooling time, the lapse of time *itself short,* and enforced by the absence of the offender, had only more and more excited the outraged passions of the defendant, and caused him to do an act which it is unreasonable to suppose he would have committed without them. They were properly admitted in mitigation of damages, and were as essentially a part of the case as the assault itself.

We come now to consider briefly the motion to set aside the verdict because the damages assessed by the jury were insufficient and inadequate.

In personal torts and actions generally sounding in damages, it being within the strict province of the jury to estimate the injury, unless there be a manifest abuse, the court will not interfere. In its general acceptation, this rule applies equally to an unjust assessing of the damages, as to an intemperate excess.

Justice Buller says (Bull. N. P., 327): "In actions grounded upon torts the jury are the sole judges of the damages; and therefore the court in such cases will not grant a new trial on account of the damages being trifling or excessive."

This was the rule at common law, and was strictly followed in this state until enlarged by statute. 1 Rob. Pr., 378; 1 Rev. Code, p. 510, secs. 96–7. And this court said in *Rixey* v. *Ward*, 3 Rand., 52: "When a new trial is granted for such cause, it is not necessary to state in the record the grounds for awarding it, since it will be presumed that the order of the court upon a subject which the statute has put within its jurisdiction, was correct unless the contrary appeared." Ch. 173, sec. 15, Code of 1873, and the numerous cases cited.

But the question has nevertheless rested very largely in the discretion of the jury. It was said by this court in the late case of *Daingerfield* v. *Thompson*, 33 Gratt., 136: "The question of what damages the plaintiff sustained, was a question for the jury to determine. The appellate court will not interfere with such a verdict unless it appears that the verdict is plainly extravagant and excessive."

The reason for holding parties so tenaciously to the damages found by the jury in personal torts is, that in cases of this class there is no scale by which the damages are to be graduated with certainty. They admit of no other test than the intelligence of the jury, governed by a sense of justice. It is indeed one of the principal causes in which the trial by jury has originated.

From the prolific fountain of litigation, numerous cases must daily spring up, calling for adjudication for alleged injuries, accompanied with facts and circumstances affording no definite standard by which these alleged wrongs can be measured, and which, from the necessity of the case, must be judged of and appreciated by the views that may be taken of them by impartial men. To the jury, therefore, as a favorite and almost sacred tribunal, is committed, by unanimous consent, the exclusive task of examining those facts and circumstances, and valuing the injury, and awarding compensation in the shape of damages. The law, which confers on them this power, and

exacts of them the performance of the solemn trust, favors the presumption that they are actuated by pure motives. It therefore makes every allowance for different dispositions, capacities, views, and even frailties, in the examination of heterogenous matters of fact, when no criterion can be supplied. And it is not until the result of the deliberations of the jury appears in a form calculated to shock the understanding, and impress no dubious conviction of their prejudice and passion, that courts have found themselves compelled to interfere. Graham and Waterman on N. T., p. 452.

In this case there has been no definite proof of any actual outlay, costs and expenses, except generally, and the jury seem to have been to some degree impressed with the injuries to the plaintiff, and his pain and anguish, and loss of time; for while $1,375 does not seem to satisfy the plaintiff, it doubtless appears to be a large sum to the defendant, and may have been so regarded by the jury. We have no evidence of the financial situation of the defendant, but this sum in this community would not be regarded as insignificant, and especially in view of the fact that the plaintiff, though greatly injured at the time, has sustained no permanent bodily injury.

The defendants in error submit without complaint to the verdict and judgment of the court below, and do not seek to have it disturbed here; but there is a principle of law, not alluded to or relied on here, which might have an important bearing on the case under its circumstances. It is this: "It is the duty of a person to use ordinary and reasonable care and means to prevent an injury, and the consequences of it; and he can only recover damages for such losses as could not, by such care and means, be avoided."

When a party, knowing he is to be attacked, arms himself with two pistols and goes forth to fight, it can scarcely be said that he did all in his power to avoid the injury which he receives. By such a course *he attests his courage,* but not so

much that *care and caution* which is above suggested as essential to any recovery. Field on Damages, p. 29, sec. 32.

Upon the whole case, however, considering all the errors assigned, we are of opinion to affirm the judgment of the court below.

JUDGMENT AFFIRMED.