Helen C. BOYD, et al., Plaintiffs,

v.

R.A. BULALA, M.D., Defendant.

Civ. A. No. 83-0557-A-C.

United States District Court,
W.D. Virginia,
Charlottesville Division.

Nov. 12, 1987.

---

J. Randolph Parker, Charlottesville, Va., Rosemarie Annunziata, McLean, Va., William O. Snead, III, Fairfax, Va., for plaintiffs.

Phillip C. Stone, Ronald D. Hodges, Harrisonburg, Va., for defendant.

Mary Sue Terry, Atty. Gen. of Va., William L. Thurston, Gregory E. Lucyk, Asst. Attys. Gen., Richmond, Va., for intervenor.

Joanne I. Schwartz, Trial Atty., Torts Branch, Civ. Div., U.S. Dept. of Justice, Washington, D.C., for amicus.

MICHAEL, District Judge.

This matter comes before the court upon the motion by the defendant for post-judgment relief and upon the motion by the Commonwealth of Virginia, intervenor in this action, to reconsider the court's earlier ruling on the constitutionality of section 8.01–581.15 of the Code of Virginia.

The plaintiffs, Helen and Roger Boyd, and their infant daughter, Veronica Lynn, charged Dr. R.A. Bulala with breaching the standard of care for obstetricians in Virginia. The Boyds alleged that Dr. Bulala failed to assess Mrs. Boyd's labor after he was notified of her admission to the hospital, and that he made a deliberate decision not to monitor her progress during the early morning hours immediately following that admission. They further alleged that Dr. Bulala's usual practice was to come to the hospital only after the infant crowned, even though he knew his conduct endangered both mother and infant. Because of this negligent practice, the Boyds charged, Dr. Bulala failed to attend Mrs. Boyd during labor and delivery, causing severe injuries to the infant.

The evidence at trial was largely uncontroverted, especially as to the critical facts and as to the standard of care appropriate to this case. It showed that shortly after 4:00 a.m. on January 31, 1982, Dr. Bulala was notified that Mrs. Boyd had been admitted to the Clinch Valley Community Hospital in active labor. Dr. Bulala knew that Mrs. Boyd was three weeks before term and that she had delivered before, and he consequently should have realized that she might deliver quickly. He nevertheless elected to remain at home, some twenty minutes or so away, after receiving the call from the hospital.

In his brief conversation with the nurse who called to advise him of Mrs. Boyd's admission, Dr. Bulala did not obtain the information necessary to assess the progress of Mrs. Boyd's labor. He specifi-

cally did not ascertain the station of the fetus in the birth canal or the duration and strength of contractions. Dr. Bulala knew that he alone was responsible for assessing labor. He knew that the nurses did not possess the necessary knowledge or training to perform such an assessment. He was also aware that the hospital was short-staffed at night, and that the nurses had failed to monitor patients properly in the past. Nonetheless, Dr. Bulala relied on the nurses to monitor Mrs. Boyd's labor and to discern any signs of trouble. According to the hospital chart, Mrs. Boyd was not checked regularly following her admission.

At 7:00 a.m., Mrs. Boyd's cervix was fully dilated, signaling the start of the second stage of labor. The nurses did not call Dr. Bulala, however, because he had ordered them not to summon him for off-hours deliveries until the baby actually crowned, that is, when the baby's head reached the vaginal opening. This order ensured that Dr. Bulala would be absent for everything but the final stage of labor, and posed the risk that he would arrive after delivery.

Sometime after Mrs. Boyd was admitted to the hospital, the fetus suffered acute distress. At 7:45 a.m., a nurse discovered that the fetal heart rate had dropped to 84, well below the normal range of 120–140 beats per minute. Unprepared for such an emergency, the nurses notified Dr. Bulala. Shortly afterward, Mrs. Boyd's membranes ruptured, and she was rushed to the delivery room. The baby was born, blue and limp, before Dr. Bulala arrived at the hospital. When Dr. Bulala at last entered the delivery room, he saw Mrs. Boyd and demanded, "Couldn't you wait?" This remark caused Mrs. Boyd a great deal of pain, both at the time and later, as the extent of the infant's injuries became apparent.

In depositions and trial testimony, Dr. Bulala admitted that he had lowered his standard of care when he moved to Tazewell County in southwestern Virginia. He also acknowledged that in ordering the night nurses to summon him at crowning, he ran the risk that he would not arrive before delivery, endangering both mother and infant. When queried about why he did not come to the hospital in a timely fashion, his answer was that doctors also needed their sleep. Dr. Bulala went on to acknowledge that he failed to assess Helen Boyd's labor when she was admitted to the hospital.

Expert testimony clearly established that Dr. Bulala's conduct fell well below the standard of care in Virginia. Dr. Guy M. Harbert, Jr., Professor of Obstetrics and Gynecology at the University of Virginia Medical School, testified that an obstetrician is responsible for assessing the progress of labor and attending the patient accordingly. He testified that with a full-term patient who has delivered before, most obstetricians attend when the patient is in active labor and her cervix is dilated 7–8 centimeters. In Mrs. Boyd's case, Dr. Harbert stated, earlier attendance was clearly required by the facts available when she was admitted. Dr. Scott D. Vogel, an obstetrician in private practice in Charlottesville, testified that Dr. Bulala's policy inevitably shifted responsibility for diagnosis and treatment to the nurses, setting the stage for the events which ensued. Dr. Harbert compared Dr. Bulala's order to be called at crowning to Russian roulette, and Dr. Bulala's own expert witness, Dr. James V. Moore, Jr., agreed that such a practice was egregious. Expert testimony also showed that Dr. Bulala might well have prevented Veronica Boyd's injuries if he had been present to assess and manage Mrs. Boyd's labor.

Because of the ischemic encephalopathy —brain injury caused by deprivation of oxygen—she suffered before birth, Veronica Boyd was afflicted with severe cerebral palsy, profound mental retardation, and a seizure disorder. These conditions gave rise to other problems, including feeding difficulties, recurrent pneumonia, and a danger of bone deformation. Uncontroverted testimony at trial established that Veronica would never walk, that she could possibly develop mentally to the level of a one-year-old child, and that she would require institutional care for the rest of her life. Similarly uncontroverted was the ex-

pert testimony on the infant's life expectancy, costs of the necessary intensive institutional care, and on the other costs associated with maintaining and caring for the infant.

Based on this evidence, the jury returned verdicts totaling $8,300,000 against the defendant and for the various plaintiffs, allocated as follows: (1) $1,850,000 in compensatory damages for Veronica Boyd; (2) $1,575,000 in compensatory damages for Helen Boyd; (3) $1,175,000 in compensatory damages for Roger Boyd; (4) $1,700,000 in compensatory damages for Helen Boyd and Roger Boyd, jointly, for Veronica's past medical costs and future medical costs until her eighteenth birthday; (5) $1,000,-000 in punitive damages for Veronica Boyd; and (6) $1,000,000 in punitive damages for Helen Boyd. The defendant then moved to reduce the judgment to conform with the limit on damages imposed by Va.Code § 8.01–581.15. This court denied the motion, holding that the statute was void because it violated the separation of powers and infringed upon the right to a civil jury trial guaranteed by the United States Constitution and the Virginia Constitution. *Boyd v. Bulala,* 647 F.Supp. 781 (W.D.Va. 1986).

Shortly after the court issued its opinion, the Attorney General of the Commonwealth of Virginia moved to intervene, requesting the opportunity to argue in defense of the statute. The court granted the motion to intervene and took under advisement the Commonwealth's motion to reconsider under Rule 59(e) of the Federal Rules of Civil Procedure, thereby suspending the running of the appeal period. App. Rules 4(a)(4); 16 C. Wright, A. Miller, E. Cooper & E. Gressman, *Federal Practice & Procedure,* § 3950 at 364 (1977). Because the court's earlier ruling upheld the statute as to equal protection and due process requirements, the court declined to hear reargument on those issues. *See Boyd v. Bulala,* 647 F.Supp. at 786–88. The court limited the motion to reconsider to the question of whether the statute vio-lated the right to trial by jury guaranteed by the seventh amendment of the United States Constitution and article I, section 11 of the Virginia Constitution. By leave of the court, the United States filed a brief and argued at the hearing as an *amicus curiae.*

Following argument, the court took the matter under advisement. The court has scrutinized the submissions of the parties and carefully considered the questions of the case. For the reasons stated below, the court will deny the Commonwealth's motion to reconsider and deny defendant's motion for post-judgment relief.

### The Constitutionality of Virginia Code § 8.01–581.15

The seventh amendment to the United States Constitution guarantees the right to a jury trial in a civil case brought under diversity jurisdiction in federal court.[1] *Byrd v. Blue Ridge Rural Electric Co-op., Inc.,* 356 U.S. 525, 78 S.Ct. 893, 2 L.Ed.2d 953 (1958). The amendment provides,

> In Suits at common law, where the value in controversy shall exceed twenty dollars, the right of trial by jury shall be preserved, and no fact tried by a jury, shall be otherwise reexamined in any Court of the United States, than according to the rules of common law.

Too often neglected in modern times, the seventh amendment is a testament to the commitment of our forebears to a right for which they fought in the Revolution and which they demanded in the Bill of Rights. As Chief Justice Rehnquist has written, "The founders of our Nation considered the right of trial by jury in civil cases an important bulwark against tyranny and corruption, a safeguard too precious to be left to the whim of the sovereign, or, it might be added, to that of the judiciary." *Parklane Hosiery v. Shore,* 439 U.S. 322, 343, 99 S.Ct. 645, 657–58, 58 L.Ed.2d 552 (1979) (Rehnquist, J., dissenting).

In colonial America, the Crown's use of bench trials to circumvent the right to a

---

1. Because the seventh amendment is determinative of this case, the court declined to certify the case to the Virginia Supreme Court under the newly promulgated Rule 5:42 of the Virginia Rules to consider the Virginia constitutional provision, treated *infra* in this opinion.

jury was one of the chief grievances of those who advocated independence. Wolfram, *The Constitutional History of the Seventh Amendment*, 57 Minn.L.Rev. 639, 654, n. 47 (1973). Among the oppressive acts cited in the Declaration of Independence are laws "depriving us, in many Cases, of the Benefits of Trial by Jury." The thirteen new American states all guaranteed the right to trial by jury in civil cases. In fact, "[t]he right to trial by jury was probably the only one universally secured by the first American state constitutions...." L. Levy, Legacy of Suppression: Freedom of Speech and Press in Early American History 281 (1960), quoted in *Parklane Hosiery*, 439 U.S. at 341, 99 S.Ct. at 656 (Rehnquist, J., dissenting).

The omission of the right to a civil jury trial was one of the principal objections raised to the proposed Constitution in the ratification debates in the various states. Wolfram, *supra*, at 667–725. Among the arguments advanced for civil jury trials were "the protection of debtor-defendants; the frustration of unwise legislation; ... the vindication of the interests of private citizens in litigation with the government; and the protection of litigants against overbearing and oppressive judges." Wolfram, *supra*, at 670–71. Ultimately, these arguments prevailed when Congress passed the seventh amendment in 1789 and Virginia completed the ratification of the first ten amendments in 1791.

This necessarily foreshortened history of the seventh amendment thus reveals that the right to a civil jury trial was intended to serve as an important check upon the legislature and the judiciary. Indeed, Thomas Jefferson called the right "the only anchor yet imagined by man, by which a government can be held to the principles of its constitution." The Writings of Thomas Jefferson 71 (Washington ed. 1861).

This heritage forms the foundation for modern decisions concerning the right to a jury in civil cases. Because the seventh amendment states that the right of trial by jury shall be "preserved," the Supreme Court has consistently applied a historical standard in interpreting the amendment. In applying this standard, the Court has distinguished the substance of the common-law right prevailing in the late eighteenth century from the procedural devices of the day. "The aim of the Amendment, as this Court has held, is to preserve the substance of the common-law right of trial by jury, as distinguished from mere matters of form or procedure, and particularly to retain the common-law distinction between the province of the court and that of the jury...." *Baltimore & Carolina Line v. Redman*, 295 U.S. 654, 657, 55 S.Ct. 890, 891, 79 L.Ed. 1636 (1935). Thus, the seventh amendment has not impeded procedural reform.[2]

The impact of the amendment on substantive changes in tort law presents another question entirely. The statute at issue here, Virginia Code section 8.01–581.15, currently provides:

> In any verdict returned against a health care provider in an action for malpractice where the act or acts of malpractice occurred on or after October 1, 1983, which is tried by a jury or in any judgment entered against a health care provider in such an action which is tried without a jury, the total amount recoverable for any injury to, or death of, a patient shall not exceed one million dollars.[3]

By limiting recovery in this way, the statute substantially diminishes the role of the jury in determining damages, at least in cases such as this, where the proven damages far exceed the amount of the cap. Constitutional analysis must therefore focus on whether the seventh amendment guarantees the determination of damages by a jury, bearing in mind the Supreme Court's admonition that "[m]aintenance of the jury as a fact-finding body is of such importance and occupies so firm a place in

---

2. Indeed, the scholarly literature concerning the seventh amendment consists largely of efforts to clear the way for various procedural reforms. *See, e.g.*, Scott, *Trial by Jury and the Reform of Civil Procedure*, 31 Harv.L.Rev. 669 (1918).

3. At the time of Veronica Boyd's birth, the limit was $750,000.

our history and jurisprudence that any seeming curtailment of the right to a jury trial should be scrutinized with the utmost care." *Dimick v. Schiedt*, 293 U.S. 474, 486, 55 S.Ct. 296, 301, 79 L.Ed. 603 (1935).

The Supreme Court recently declared that the seventh amendment protects the most fundamental elements of a jury trial. *Tull v. United States*, — U.S. ——, —— ——, 107 S.Ct. 1831, 1839–40, 95 L.Ed.2d 365 (1987). Although *Tull* concerned the assessment of statutory civil penalties rather than damages, the case provides some guidance. Under *Tull*, the question for this court is whether the determination of damages is one of "those incidents which are regarded as fundamental, as inherent in and of the essence of the system of trial by jury." *Id.*, quoting Scott, *Trial by Jury and the Reform of Civil Procedure*, 31 Harv.L.Rev. 669, 671 (1918). Among the elements which are of the essence of trial by jury, Professor Scott lists the province of the jury as finders of fact. Scott, *supra*, at 675. As he notes, it has been settled since the time of Lord Coke that questions of fact are reserved for the jury. *Id.* Coke himself stated it as a maxim: *ad questionem facti non respondent judices.* E. Coke, *First Part of the Institutes of the Laws of England*, § 155b (15th ed. London 1794).

Among the most important factual questions for the jury is the question of damages. History shows that at the time the seventh amendment was ratified, the common law reserved the determination of damages for the jury. The framers' authority on the common law was, of course, Blackstone's *Commentaries*. W. Solberg, *The Federal Convention and the Formation of the Union of the American States*, xlv (1958). Blackstone made clear that the question of damages was for the jury alone. For example, in discussing interlocutory judgments, he wrote:

> But the interlocutory judgments, most usually spoken of, are those incomplete judgments, whereby the *right* of the plaintiff is indeed established, but the *quantum* of damages sustained by him is not ascertained: which is a matter that

cannot be done without the intervention of a jury.

W. Blackstone, 3 *Commentaries on the Laws of England* *397. Early cases confirm that this rule of common law governed in American courts. *Ross v. Overton*, 7 Va. (3 Call 309, 319) 268, 276 (1802); *Coffin v. Coffin*, 4 Mass. 1, 41–42 (1808).

■ Unlike the assessment of civil penalties discussed in *Tull, supra*, the assessment of damages has always been a matter "peculiarly within the province of the jury." *Va. Mid. R.R. Co. v. White*, 84 Va. 498, 508, 5 S.E. 573 (1888). *See also Ward v. White*, 86 Va. 212, 219–221, 9 S.E. 1021 (1889). In terms of the jury's role, history justifies no distinction between the liability and remedy phases of a trial of a common-law action. To the contrary, the determination of liability and the assessment of damages are both questions which the common law reserved for the jury. At common law, a party had a right to have a jury determine the severity of the injury through an assessment of damages. Under the seventh amendment, this right is preserved.

The values underlying the seventh amendment support the conclusion that the assessment of damages is among the jury functions protected by the amendment. As Chief Justice Rehnquist has noted, trial by jury was important to the founders because they valued the jurors' common sense, their ability to administer the law according to the wishes of the community—and their willingness to reach a result that a judge would not reach. *Parklane Hosiery*, 439 U.S. at 344, 99 S.Ct. at 658 (Rehnquist, J., dissenting.)

> The inconveniences of jury trial were accepted precisely because in important instances, through its ability to disregard substantive rules of law, the jury would reach a result that the judge either could not or would not reach. Those who favored the civil jury were not misguided tinkerers with procedural devices; they were, for the day, libertarians who avowed that important areas of protection for litigants in general, and for debtors in particular, would be placed in

grave danger unless it were required that juries sit in civil cases.

*Id.,* n. 11 (quoting Wolfram, *supra,* at 671–72).

The seventh amendment rests on pragmatic considerations about the outcome of litigation. The guarantee provided by the amendment is, quite simply, the possibility of procuring a different result by choosing a jury trial. To be meaningful, the amendment must protect the ability of the jury to make a difference in the outcome of the trial. Clearly, the determination of damages is one of the principal ways by which the jury affects the result of a case. The assessment of damages by the jury falls squarely within the protection of the seventh amendment.

 The fates of both *additur* and *remittitur* under the seventh amendment confirm that the determination of damages is part of the "substance of the common-law right of trial by jury." *Colgrove v. Battin,* 413 U.S. 149, 157, 93 S.Ct. 2448, 2453, 37 L.Ed.2d 522 (1973). *Additur* is prohibited under the seventh amendment because it would require a plaintiff "to forego his constitutional right to the verdict of a jury" and accept instead an assessment "partly made ... by a tribunal which has no power to assess." *Dimick v. Schiedt,* 293 U.S. at 487, 55 S.Ct. at 301. *Remittitur* is allowed only when the verdict cannot be justified upon the evidence, and only if the court affords the plaintiff the option of a new trial. *Kennon v. Gilmer,* 131 U.S. 22, 29, 9 S.Ct. 696, 698–99, 33 L.Ed. 110 (1889); *Scott v. Plante,* 641 F.2d 117, 136 (3d Cir.1981). When a verdict is set aside, "both parties remain entitled, as they were entitled in the first instance, to have a jury properly determine the question of liability *and the extent of the injury by an assessment of damages." Dimick v. Schiedt,* 293 U.S. at 486, 55 S.Ct. at 301 (emphasis added).

 The Commonwealth argues that the power of the legislature to alter or abolish common-law actions includes the power to enact a limitation on recovery, regardless of the effect of the statute on the role of the jury. It is true that the Virginia General Assembly may constitutionally abolish a cause of action, and the attaching right to a jury trial. Nothing in the Virginia Constitution prohibits this, nor does the U.S. Constitution require the perpetuation of common-law actions. *Silver v. Silver,* 280 U.S. 117, 122, 50 S.Ct. 57, 58, 74 L.Ed. 221 (1929). It does not follow, however, that the legislature may constrict the right to a jury trial in the common-law actions which are retained. To the contrary, the seventh amendment commands that the right to trial by jury "shall be preserved." The legislature cannot, in the guise of shaping and delineating the cause of action, diminish this right.

Likewise, the Commonwealth may not invoke the purpose of the statute to justify invading the province of the jury. The seventh amendment, like other constitutional provisions, imposes limits on the legislature's power, and these limits may sometimes hamper the pursuit of legitimate goals.

> The guarantees of the Seventh Amendment will prove burdensome in some instances; the civil jury surely was a burden to the English governors who, in its stead, substituted the vice-admiralty court. But, as with other provisions of the Bill of Rights, the onerous nature of the protection is no license for contracting the rights secured by the Amendment.

*Parklane Hosiery,* 439 U.S. at 346, 99 S.Ct. at 659 (Rehnquist, J., dissenting). Though the legislature has broad power to regulate matters affecting public health and welfare, it may not infringe on a party's right to trial by jury in a federal court.

 State court proceedings are not governed by the seventh amendment, but by corresponding provisions in state constitutions. *New York Central R.R. v. White,* 243 U.S. 188, 37 S.Ct. 247, 61 L.Ed. 667 (1917); *Minneapolis & St. L. R.R. v. Bombolis,* 241 U.S. 211, 36 S.Ct. 595, 60 L.Ed. 961 (1916); *Walker v. Sauvinet,* 92 U.S. (2 Otto) 90, 23 L.Ed. 678 (1876). Recognizing that a disparity between federal and state guarantees might force a reexamination of the rule that the seventh amendment ap-

plies in diversity actions, *Byrd v. Blue Ridge Rural Electric Co-op., Inc.,* 356 U.S. 525, 78 S.Ct. 893, 2 L.Ed.2d 953 (1958), this court earlier undertook to analyze the right to civil jury trials provided by the Virginia Constitution. *Boyd v. Bulala,* 647 F.Supp. at 788–90. The court concluded that the right to trial by jury guaranteed in article I, section 11 of the Virginia Constitution is equivalent to, or arguably stronger than, the right secured by the seventh amendment. *Id.*

Indeed, history indicates that if the two provisions differ at all in scope, it is the state right which is stronger. Article I, section 11 of the Virginia Constitution provides, "That in controversies respecting property, and in suits between man and man, trial by jury is preferable to any other, *and ought to be held sacred.*" (Emphasis added.) Written by George Mason, this provision has been preserved essentially unchanged since 1776. Howard, 1 *Commentaries on the Constitution of Virginia* 244–45 (1974). Mason later opposed the proposed federal constitution because it lacked a bill of rights. In particular, he championed the right to trial by jury in civil cases. Wolfram, *supra,* at 667. The seventh amendment represents the national endorsement of Mason's principle, which was already firmly established in the Virginia constitution.

Since Mason's time, the Virginia Supreme Court has zealously guarded the right to a jury. *See Boyd v. Bulala,* 647 F.Supp. at 788–90. In particular, the court long ago made clear that the assessment of damages as a factual matter is the province of the jury in Virginia. *Norfolk & Western R.R. Co. v. Anderson,* 90 Va. 1, 9, 17 S.E. 757 (1893); *Ward v. White,* 86 Va. 212, 219–221, 9 S.E. 1021 (1889); *Borland v. Barrett,* 76 Va. 128, 137 (1882). This court therefore has little fear that today's ruling, which is based on the seventh amendment to the U.S. Constitution, will provide to litigants in this court greater protection than they enjoy in the courts of the Commonwealth. *See Williams v. Van Der Woulde,* Circuit Court of Fairfax County, At Law No. 70286, pp. 23–29 (1986).

■ For the foregoing reasons, this court will deny the Commonwealth's motion to reconsider and confirm its earlier ruling that Va. Code § 8.01–581.15 infringes on the right to trial by jury guaranteed by the seventh amendment and consequently is void.

*Defendant's Motion for Post-Judgment Relief*

■ Dr. Bulala moved the court either to grant a new trial or to open the record to admit new evidence. This motion, made under Rules 59(a), 59(e), and 60 of the Federal Rules of Civil Procedure, was prompted by the death of the infant plaintiff, Veronica Lynn Boyd, some six weeks after the trial. Dr. Bulala argues that if Veronica had died before trial, the Boyds could not have recovered certain elements of damages, including her future medical costs. This assertion is correct, but it does not follow that Dr. Bulala is entitled to a new trial or to open the record to admit evidence. Under Rules 59 and 60(b)(2), newly discovered evidence must pertain to facts which existed *at the time of trial. NLRB v. Jacob E. Decker & Sons,* 569 F.2d 357, 364 (5th Cir.1978); *Strobl v. New York Mercantile Exchange,* 590 F.Supp. 875, 878 (S.D.N.Y.1984), *aff'd,* 768 F.2d 22 (2d Cir.) *cert. denied,* 474 U.S. 1006, 106 S.Ct. 527, 88 L.Ed.2d 459 (1985). Were the rule otherwise, litigation would never end. Moreover, Virginia Code § 8.01–21 specifically provides for the entry of judgment when a party dies after the verdict. *See Boyd v. Bulala,* 647 F.Supp. at 795. Dr. Bulala cannot open the record to present evidence concerning an event which occurred six weeks after the verdict, nor can Veronica Boyd's death serve as the basis for a new trial.

The remaining ground for Dr. Bulala's motion is Rule 60(b)(6), which provides, "On motion and upon such terms as are just, the court may relieve a party ... from a final judgment, order, or proceeding for the following reasons: ... (6) any other reason justifying relief from the operation of a judgment." Dr. Bulala contends that Veronica Boyd's premature death justifies relief

under this rule, and he urges the court to weigh the equities of this case against the rule regarding the finality of judgments.

This balancing test is seriously flawed, however. Because the weight accorded to the finality of a judgment necessarily increases as time passes, the test, as advanced by the defendant, would allow relief when the plaintiff dies prematurely, but would deny relief when the plaintiff lives longer than expected. Thus, while the balancing test is neutral on its face, in operation it is strongly biased toward defendants and against plaintiffs.

Here, the jury properly based the verdicts on uncontradicted evidence of Veronica Boyd's life expectancy and the cost of her care. Had Veronica lived longer than expected, she certainly could not have returned to court to demand that her judgment be increased. The defendant cannot, by his argument, be allowed to profit from the child's premature death by securing a reduction in the judgment.

Some states have enacted statutes providing for periodic payment of damages, with payments ceasing if the plaintiff dies earlier than predicted. *E.g.,* Fla.Stat.Ann. § 768.51 (Harrison 1984); Cal.Civ.Proc. Code § 667.7 (West 1980); Wis.Stat.Ann. § 655.015 (West 1980). Virginia law, which governs in this diversity action, contains no such provision, and this court will not enact one in the guise of granting a Rule 60 motion.

For the foregoing reasons, defendant's motion for post-judgment relief will be denied.

An appropriate Order shall this day issue.

### ORDER

For the reasons stated in the accompanying Memorandum Opinion, it is this day

### ADJUDGED AND ORDERED

as follows:

1. The Commonwealth of Virginia's motion to reconsider shall be, and it hereby is, denied.

2. Defendant's post-judgment motions shall be, and they hereby are, denied.

3. The above-styled action shall be, and it hereby is, dismissed with prejudice and stricken from the docket of the court.

The Clerk of the Court is hereby directed to send a certified copy of this Order to all counsel of record.