**Theresa DAVIS, Appellee,**

v.

**Dr. Akin OMITOWOJU, Appellant.**

**Theresa DAVIS, Appellant,**

v.

**Dr. Akin OMITOWOJU, Appellee.**

**Nos. 88–3754, 88–3802.**

United States Court of Appeals, Third Circuit.

Argued April 25, 1989.

Decided Aug. 16, 1989.

R. Eric Moore (argued), Christiansted, St. Croix, U.S. V.I. for Dr. Akin Omitowoju, appellant/cross-appellee.

George Marshall Miller (argued), St. Thomas, U.S. V.I. for Theresa Davis, appellee/cross-appellant.

Before HUTCHINSON, COWEN, and GARTH, Circuit Judges.

## OPINION OF THE COURT

GARTH, Circuit Judge:

This appeal and cross appeal present us with a relatively new issue involving the applicability of the Seventh Amendment to a medical malpractice liability cap.

The plaintiff, Theresa Davis, ("Davis") obtained a jury verdict in her favor and against Doctor Akin Omitowoju ("Doctor") in the sum of $640,000. The Virgin Islands legislature in 1975 capped medical malpractice verdicts at $250,000 for non-economic damages. 27 V.I.C. § 166b (1975).[1] Accordingly, Judge Christian, on June 14, 1988, reduced the verdict in Davis' favor to $250,000 for her non-economic damages and $153,294.92 for her economic damages (medical expenses, loss of wages, etc.) to a judgment totalling $403,294.92.

The Doctor appeals the judgment on a number of grounds at 88–3754. Davis cross-appeals at 88–3802 seeking the full benefit of the jury verdict and charging that the cap legislation, 27 V.I.C. § 166b, will not withstand constitutional scrutiny particularly with respect to the Seventh Amendment.

Because of the importance of the Seventh Amendment issue and the dearth of authority addressing that issue, we will analyze that question first, and in so doing will affirm (albeit based on a different analysis) the district court's order which rejected Davis' Seventh Amendment challenge to the legislation. We will then discuss the other issues raised on appeal by the Doctor, and while we agree with the district court's decisions in those respects as well, we will nevertheless vacate the judgment and remand for correction of a technical error in the calculation of Davis' damages.

### I.

Davis injured her knee when she slipped and fell at her place of employment. She was treated by Dr. Omitowoju. The Doc-

tor suggested to Davis that arthroscopic surgery would help her. Davis testified that the Doctor told her that he would not cut open her knee, but would only perform arthroscopy, a procedure that involves a small puncture of the knee. (A. 212).

At 10 p.m. on the night before the operation, while Davis lay in bed in the hospital, a nurse brought Davis a consent form for her to sign. The Doctor was not present and the nurse did not explain the form to Davis. The description of the procedure was handwritten and largely illegible. (A. 585). Davis, who has a seventh grade education, testified that she recognized the word "arthroscopy" and signed the permit.

As it turned out the handwriting on the form stated "Arthroscopy and excision of mass right knee and possible arthrotomy."[2] The form itself stated "Type of Surgery or treatment to be filled in by Physician in Terms Understandable by Patient." In fact the operation consisted of arthroscopy, and an arthrotomy during which the Doctor removed Davis' medial meniscus (knee cartilage) shaved articular cartilage from the bones of her knee, and also drilled into her knee. (A. 266–67).

Davis was dissatisfied with the results of her operation. She was subsequently treated and operated upon a number of times by a number of different doctors. On March 11, 1986 Davis filed a complaint with the Virgin Islands Malpractice Review Committee, as required by the Virgin Islands Malpractice Act, 27 V.I.C. § 166i(b). The Committee found that no malpractice had occurred. Davis then filed suit in the district court. A trial commenced on May 18, 1988 and on May 20, 1988 the jury rendered a verdict in the amount of $650,-000 in favor of Davis.

After the jury's verdict the district court requested that both sides submit briefs in order to conform the verdict to 27 V.I.C. § 166b (1975) which reads as follows:

---

**1.** In 1986, 27 V.I.C. § 166b was amended to limit *both* economic and non-economic verdicts to $250,000. 1986 V.I.Sess.Laws 171. Our discussion and analysis with respect to the former statute is equally applicable to the amended statute.

**2.** An arthrotomy is a surgical incision into a joint.

The total amount recoverable for any injury of a patient may not exceed two hundred and fifty thousand dollars ($250,000) plus actual expenses up to the time of trial not paid or payable or reimbursed from any other source for reasonable and necessary medical care, custodian care and/or rehabilitation services, and estimated future expenses not reimbursable or payable from any other source for care and/or rehabilitation services for each anticipated year of need; and lost earnings. The recovery in an action for wrongful death of a patient shall be as provided in 5 Virgin Islands Code, Section 76.

On June 3, 1988, Davis submitted a motion seeking to have the district court declare the limitation on the jury's damage award unconstitutional. Thereafter, the district court issued an opinion which concluded that the damage award should be reduced to $403,294.92. Davis then sought reconsideration, requesting the court to address her constitutional arguments. The district court denied the motion for reconsideration stating rather cryptically:

the Court having considered the motion of plaintiff to reconsider its Order entered June 14, 1988, and the Court bearing in mind that it was within the competence of the Legislature of the Virgin Islands in waiving the immunity from tort actions granted its employees by the Revised Organic Act, to do so on specific terms and conditions,

It is ORDERED that the motion of plaintiff for reconsideration be, and the same is, hereby DENIED.

(A. 600).[3]

Concluding that Davis' constitutional claims are properly before us on appeal, we turn first to them.[4]

## II.

■■■■ In her cross-appeal, Davis raises three constitutional objections to the reduction of the jury verdict. She claims that the court's order violates due process, equal protection, and her right to a trial by jury under the Seventh Amendment.

We find no merit in Davis' first two claims. As the Fourth Circuit stated in disposing of both the due process and equal protection claims advanced in *Boyd v. Bulala*, 877 F.2d 1191 (4th Cir.1989), "a limitation on a common law measure of recovery does not violate a fundamental right or create a suspect classification." Davis did not assert any fundamental right to an uncapped jury verdict, nor could she. Nor has Davis attempted to, nor could she, style herself and all malpractice claimants as a suspect class. Any claim that she asserts must therefore be reviewed under the rational basis test. *Id.* at 1196.

Clearly the Virgin Island's decision to curb, through legislation, the high costs of malpractice insurance and thereby promote quality medical care to the residents of the islands, provides a rational basis for capping the amount of damages that can be awarded a plaintiff.[5] Indeed, other courts

---

**3.** There is no basis in the record that we can determine for the district court's reference to Virgin Islands tort immunity. The Doctor was acting in his private capacity when he treated Davis, and she sued him as a private individual. The complaint makes no mention of the Government of the Virgin Islands, nor does it allege any waiver of tort immunity.

**4.** We were initially concerned about a possible appellate jurisdictional defect. Though no separate judgment was entered, an entry reflecting the memorandum opinion of the district court which reduced the jury verdict, appears on the docket sheet on June 15, 1988. *See Bankers Trust Co. v. Mallis*, 435 U.S. 381, 98 S.Ct. 1117, 55 L.Ed.2d 357 (1978). The Doctor's motion for a judgment notwithstanding the verdict was timely filed. The district court denied that mo-

tion on October 26, 1988, and therefore the notice of appeal which was filed on November 4, 1988, was timely.

**5.** Although the 1975 amendment to Title 27 of the Virgin Islands Code, which among other things, regulates medical malpractice claims, contains no preamble, it is evident that the thrust of this legislation was to provide continuing medical care in the face of rising malpractice insurance costs and the unavailability of professional liability insurance resulting in the limitation and fear of cessation of medical practice in the islands.

This purpose found expression in the 1986 amendment to Title 27, which further cut back the amount of recovery available to a patient suffering malpractice injuries. *See* 27 V.I.C. § 166b (1986). The preamble to the 1986

of appeal which have decided due process and equal protection arguments against damage award caps have so held. *Lucas v. United States,* 807 F.2d 414 (5th Cir.1986); *Hoffman v. United States,* 767 F.2d 1431 (9th Cir.1985); *Continental Insurance Co. v. Illinois Department of Transportation,* 709 F.2d 471, 475 (7th Cir.1983). This leaves us with the argument most strongly emphasized by Davis and on which Davis relies virtually to the exclusion of her other two constitutional claims—that the Seventh Amendment precludes any reduction in the award of damages found by a jury.[6]

### A.

The text of the Seventh Amendment reads as follows:

> In suits at common law, where the value in controversy shall exceed twenty dollars, the right of trial by jury shall be preserved, and no fact tried by a jury, shall be otherwise reexamined in any Court of the United States, than according to the rules of common law.

Davis focuses on the second clause of the Amendment: "no fact tried by a jury shall be otherwise reexamined in any court ...". She argues that when the district court conformed the jury's verdict to the limits of the Virgin Islands statute, 27 V.I.C. § 166b, the court in effect reexamined the jury's factual determination of the extent of her damages. This reexamination, she claims, violated the Seventh Amendment's explicit terms.

The party's briefs as well as our own independent research reveal very little case law or literature addressing Seventh Amendment challenges similar to Davis'. One court of appeals and one district court

have ruled that a cap similar to the one at issue here does not violate the Seventh Amendment. *Boyd v. Bulala,* 877 F.2d 1191 (4th Cir.1989); *Franklin v. Mazda Motor Corp.,* 704 F.Supp. 1325 (D.Md. 1989). The Fourth Circuit, in *Boyd,* reversed the district court, which had concluded that the Virginia cap on damage recovery in medical malpractice cases was violative of the Seventh Amendment. *Boyd v. Bulala,* 647 F.Supp. 781 (W.D.Va. 1986), *reconsideration denied,* 672 F.Supp. 915 (W.D.Va.1987), *rev'd,* 877 F.2d 1191 (4th Cir.1989). *See also, Reuwer v. Hunter,* 684 F.Supp. 1340 (W.D.Va.1988) (*Reuwer* was decided by the same district court judge as decided *Boyd.*).

Because Seventh Amendment challenges, such as the one presented here, have not occurred with any frequency, the Supreme Court has had little opportunity to speak to the reexamination issue presented by Davis. Indeed, even in the Supreme Court cases which we discuss below, the Court's treatment of the Seventh Amendment, while relevant to our analysis here, can hardly be deemed dispositive.

In *Dimick v. Schiedt,* 293 U.S. 474, 55 S.Ct. 296, 79 L.Ed. 603 (1935), the jury had returned a verdict of $500 for the plaintiff in a personal injury action. The district court ordered a new trial unless the defendant consented to an *increase* of the damages to the sum of $1,500. The Supreme Court examined the powers of the English courts prior to the adoption of our Seventh Amendment and concluded that English courts did not have the power to increase a jury's verdict. The Court also discussed the practice of remittitur, although remittitur was not at issue in *Dimick.*

amendment, among other things, calls attention to the need for health care, the increased cost of insurance, the discouragement of health care providers by reason of escalating insurance premiums and concludes that "the public interest ... requires that insurance premium levels, for health care professionals must be retained in order to maintain high quality medical services for the Virgin Islands." 1986 V.I.Sess.Laws 170.

**6.** A similar issue was raised in *Berry v. Curreri,* 837 F.2d 623 (3d Cir.1988). In that case, however, we expressly declined consideration of this issue because the appeal was resolved on non-

constitutional grounds. *Id.* at 627–28. Significantly, we stated:

> Our decision not to consider the Seventh Amendment contention should not be construed as any endorsement, even tacitly, of the view of the *Boyd* court on that issue. *Id.* at 628. The *Boyd* case to which the *Berry* court adverted was the district court case of *Boyd v. Bullala,* 647 F.Supp. 781 (W.D.Va. 1986) which as we point out in text, *infra,* was subsequently reversed, but not until after *Berry* had been filed.

The Court concluded that despite the fact that remittitur was disfavored by the English Common law, it had nevertheless been the practice of the federal courts since 1822 to deny a motion for a new trial on the grounds of excessive damages if the defendant agreed to a reduction in the amount of the jury verdict. Thus the Court determined that because of the historical tradition of remittitur in our courts, it would serve no purpose to disturb that longstanding practice. *Id.* at 482–85, 55 S.Ct. at 299–300.

In *Tull v. United States*, 481 U.S. 412, 107 S.Ct. 1831, 95 L.Ed.2d 365 (1987), the Supreme Court held that it was within Congress' power and not violative of the Seventh Amendment, to provide for a Federal judge rather than a jury, to set the civil penalty in a Clean Water Act suit.[7] The Court held the following analysis must be employed in deciding under the Seventh Amendment the question of

> whether a jury must determine the remedy in a trial in which it must determine liability. The answer must depend on whether the jury must shoulder this responsibility as necessary to preserve the "substance of the common-law right of trial by jury." *Colgove v. Battin*, 413 U.S. 149, 157 [93 S.Ct. 2448, 2453, 37 L.Ed.2d 522] (1973). Is a jury role necessary for that purpose? We do not think so. " 'Only those incidents which are regarded as fundamental, as inherent in and of the essence of the system of trial by jury, are placed beyond the reach of the legislature.' " *Id.* at 156, n. 11 [93 S.Ct. at 2452 n. 11] (*quoting* Scott, *Trial by Jury and the Reform of Civil Procedure*, 31 Harv.L.Rev. 669, 671 (1918)). *See also Galloway v. United States*, 319 U.S. 372, 392 [63 S.Ct. 1077, 1088, 87 L.Ed. 1458] (1943) ("[T]he Amendment was designed to preserve the basic institution of jury trial in only its most fundamental elements").

*Tull*, 481 U.S. at 425–26, 107 S.Ct. at 1839–40. The court concluded that the civil penalty was not a fundamental part of the jury trial right. It stated that since Congress may fix the civil penalties it may delegate that determination to trial judges.

In a separate concurrence, Justice Scalia, joined by Justice Stevens, argued that the civil penalty should have been determined by the jury as well. He stated:

> Congress could, I suppose, create a private cause of action by one individual against another for a fixed amount of damages, but it surely does not follow that if it creates such a cause of action *without* prescribing the amount of damages, that issue could be taken from the jury.

*Id.* at 427, 107 S.Ct. at 1841 (emphasis in original).

*Tull*'s holding, that a civil penalty need not be determined by a jury, cannot of course answer the question that is presented in this case where the damages in a civil cause have been decided by a jury. Thus, unlike the question before the *Tull* court, the question here is: Once the remedy determination has been submitted to the jury, can legislation limit the jury's remedial authority? Stated otherwise, the inquiry to be answered is: can the legislature limit the jury's award of damages regardless of the jury's finding of the extent and value of the plaintiff's injuries?

In answering this question the district court in *Boyd v. Bulala*, 647 F.Supp. 781 (W.D.Va.1986), *reconsideration denied*, 672 F.Supp. 915 (W.D.Va.1987), *reconsideration granted*, 678 F.Supp. 612 (W.D.Va. 1988) (judgment modified to reflect monies received in settlement with co-tortfeasor), *rev'd*, 877 F.2d 1191 (4th Cir., 1989)[8], ap-

---

**7.** In an earlier part of the opinion, the Court held that a Clean Water Act defendant had a Seventh Amendment right to a jury trial on the issue of liability.

**8.** In its initial opinion, 647 F.Supp. 781 (W.D.Va. 1986), the district court concluded that the Virginia damage cap violated both the Virginia and federal constitutional provisions guaranteeing a

right to a jury trial. Both the Commonwealth of Virginia as intervenor and the United States as *amicus curiae* urged the district court to reconsider its decision. The district court refused to do so, largely on Seventh Amendment grounds, which it articulated in a second opinion denying reconsideration. 672 F.Supp. 915 (W.D.Va.1987). The judgment was subsequently reduced to reflect monies received by the

plied the language from the majority opinion in *Tull* which is quoted above, and concluded that factfinding was at the core of the jury's function and that a damages determination constituted a "fact tried by a jury." The *Boyd* district court opinion noted early common law decisions in Virginia had held that damages were "peculiarly within the province of the jury." 672 F.Supp. at 920. It further noted that the determination of both damages and liability had historically always been part of the jury's function. In response to arguments that if the Virginia legislature had the power to abolish a cause of action it could, by the same token, impose a cap on the damages found by a jury, the *Boyd* district court stated:

> It does not follow, however, that the legislature may constrict the right to a jury trial in the common-law actions which are retained. To the contrary, the seventh amendment commands that the right to trial by jury "shall be preserved." The legislature cannot, in the guise of shaping and delineating the cause of action, diminish this right.

*Boyd*, 672 F.Supp. at 921.[9]

The Fourth Circuit, in reversing the district court's judgment in *Boyd*, applied a different form of analysis. The Fourth Circuit agreed with the district court that the role of the jury is to determine the facts. However, the Fourth Circuit held that

> it is not the role of the jury to determine the legal consequences of its factual findings.... That is a matter for the legislature, and here, the Virginia legislature has decided that as a matter of law damages in excess of $750,000 are not relevant. In doing so it has not violated the Seventh Amendment. To paraphrase *Etheridge*, once the jury has made its

findings of fact with respect to damages, it has fulfilled its constitutional function; it may not also mandate compensation as a matter of law.

*Id.* at 1196.[10]

The Fourth Circuit also noted as had the district court, that the Seventh Amendment did not forbid the legislature from abolishing the cause of action for malpractice. Contrary to the district court, however, the Fourth Circuit reasoned that if the legislature could abolish the cause of action entirely without violating the Seventh Amendment, then it could properly limit the damages that could be recovered.

In *Franklin v. Mazda Motor Corp.*, 704 F.Supp. 1325 (D.Md.1989) the district court upheld the Maryland damage award cap. The *Franklin* court concluded that the legislature always shaped the issues that are given to the jury by shaping the law and that capping the damages was just another shaping of the law, well within the legislature's powers and prerogatives. *Id.* at 1331. The *Franklin* court supported this conclusion with much the same argument which was subsequently employed by the Fourth Circuit in *Boyd*, noting that if the legislature can abolish a cause of action, then it can also limit its damages.

### B.

Although we reach the same conclusion, we approach the Seventh Amendment issue somewhat differently than the manner in which *Boyd* and *Mazda* addressed that issue. We start by giving the text of the second clause of the Seventh Amendment its exact and literal meaning.

It states: "... and no fact tried by a jury, shall be otherwise re-examined in any Court of the United States, than according to the rules of the common law." We

---

plaintiffs in a settlement with another defendant co-tortfeasor. 678 F.Supp. 612 (W.D.Va.1988). The Seventh Amendment decision of the district court was ultimately reversed on appeal by the Fourth Circuit. 877 F.2d 1191 (4th Cir.1989). We discuss the Fourth Circuit's opinion, *infra.*

**9.** As earlier noted, the same district court judge continued to adhere to this argument in a later malpractice case involving the same Virginia

statute. *Reuwer v. Hunter*, 684 F.Supp. 1340 (W.D.Va.1988).

**10.** The *Etheridge* case referred to by the Fourth Circuit was *Etheridge v. Medical Center Hospitals*, 237 Va. 87, 376 S.E.2d 525 (1989) in which the Supreme Court of Virginia rejected a challenge to the Virginia cap on malpractice damages.

understand this language to operate as a guarantee of the integrity of the judicial process generally and as a check on the powers of the trial judge specifically. It is significant to us that unlike the first clause of the Seventh Amendment which in broad terms preserves the right to a trial by jury, the second clause speaks exclusively of the role of the court. The second clause makes no mention of the other branches of government.

In this case, the jury's damage verdict was not reduced by the district court judge by an act of reexamination of the jury verdict followed by an independent finding of a verdict for a different amount. Rather, the reduction that was effected came about as a result of—indeed as a requirement of—the legislation enacted by the Virgin Islands legislature. Because the district court judge was merely implementing a policy decision of the legislature in applying the law enacted by the legislature when it predetermined the extent and amount of damages that it, the legislature, would allow in a malpractice action, and because we do not read the second clause of the Seventh Amendment as limiting the exercise of such legislative authority, we are satisfied that when the district court reduced Davis' jury verdict from $640,000 to $403,294.92 it was not reexamining a "fact tried by a jury" within the meaning of this constitutional provision.[11] That "reexamination" *viz* the examination by the legislature of the need for a medical malpractice cap which resulted in the limitation of non-economic damages to $250,000, had already taken place by a branch of the government not prohibited from taking such action by the strictures of the Constitution.

Our understanding of the text of the Seventh Amendment, and its application to 27 V.I.C. § 166b (1975) brings to mind the Supreme Court's reasoning in *Parklane Hosiery Co v. Shore*, 439 U.S. 322, 99 S.Ct. 645, 58 L.Ed.2d 552 (1979). In that case, the Supreme Court had to determine, as do we, whether a "reexamination" of any fact

found by a jury had taken place. The Court addressed the question "whether a litigant who was not a party to a prior judgment may nevertheless use that judgment 'offensively' to prevent a defendant from relitigating issues resolved in [an] earlier proceeding." *Id.* at 326, 99 S.Ct. at 649. The petitioners in *Parklane*, relying upon *Dimick v. Schiedt*, 293 U.S. 474, 55 S.Ct. 296, 79 L.Ed. 603 (1935), which we discussed earlier, argued that allowing this form of collateral estoppel or issue preclusion would violate their Seventh Amendment rights. The Supreme Court rejected this argument stating:

> The petitioners' reliance on *Dimick v. Schiedt*, 293 U.S. 474 [55 S.Ct. 296, 79 L.Ed. 603], is misplaced. In the *Dimick* case the Court held that an increase by the trial judge of the amount of money damages awarded by the jury violated the *second* clause of the Seventh Amendment, which provides that "no fact tried by a jury shall be otherwise re-examined in any Court of the United States, than according to the rules of the common law." *Collateral estoppel does not involve the "re-examination" of any fact decided by a jury.* On the contrary, the whole premise of collateral estoppel is that once an issue has been resolved in a prior proceeding, there is no further fact-finding function to be performed.

*Parklane*, 439 U.S. at 336 n. 23, 99 S.Ct. at 654 n. 23 (emphasis added).

A number of other factors support our understanding of the second clause of the Seventh Amendment. In this case, Davis' argument that the actions of the district court are prohibited by the literal terms of the second clause is predicated upon the fact that the district court reduced the damage award *after* the jury had made its determination. However, if instead the district court had instructed the jury, prior to its deliberations, that damages could only be awarded up to the maximum permitted by the Virgin Islands statute, no reduction

---

11. We do not intend to imply that the legislature is *completely* free from any Seventh Amendment restrictions. Our point is simply that the second clause is primarily concerned with ac-

tions by the courts and that it does not restrict the power of the legislature as it was exercised in enacting the malpractice damage cap at issue in this case.

would have been necessary.[12] Such an instruction would clearly be proper, as the Supreme Court has consistently understood the Seventh Amendment to require that "issues of law are [to be] resolved by the court and issues of fact are to be determined by the jury under appropriate instructions by the court." *Baltimore & Carolina Line v. Redman,* 295 U.S. 654, 657, 55 S.Ct. 890, 891, 79 L.Ed. 1636 (1935); *Walker v. New Mexico & Southern Pacific Railroad Co.,* 165 U.S. 593, 596, 17 S.Ct. 421, 422, 41 L.Ed. 837 (1897). Under this hypothetical circumstance, i.e. a damage charge which required the jury to return a damage award within the prescribed statutory limit, no Seventh Amendment question could have arisen. Accordingly, if a district court can require a jury to restrict its verdict to conform to a legislative cap, as we are satisfied it can, then we are also satisfied that a district court can correct or modify an unfettered verdict so as to comply with the same legislative mandate.

Our reading of the second clause of the Seventh Amendment, i.e. that it is addressed only to the court, and not to the legislature, is bolstered as well by the historical underpinnings of the Seventh Amendment and the right to a jury trial. In discussing the jury right in colonial America, the noted legal historian John Phillip Reid observed:

A special American attachment for juries arose from the colonial worry about English common lawyers appointed by London to preside over the colonial courts who, it was feared, had a greater attachment to imperial rule than to impartial justice.

Reid, John Phillip, *Constitutional History of the American Revolution, The Authority of Rights,* 51 (1986).[13]

The Constitution as originally ratified by the states did not contain a right to a civil jury trial. However, this question—the right to a civil jury trial—arose at the framing convention, and formed one of the major points of contention at the various state ratifying conventions. The civil jury trial right was ultimately included in the Constitution with the passage of the first amendments forming the Bill of Rights. *See* Henderson, *The Background of the Seventh Amendment,* 80 Harv.L.Rev. 289 (1966). At the 1787 convention, when a proposal was put forward to add a provision for a jury right in civil cases, Madison recorded the following reactions:

Mr. Gorham [Massachusetts] It is not possible to discriminate equity cases from those in which juries are proper.

**12.** If despite this instruction, the jury returned a verdict higher than the statutory maximum, the district court could then simply have offered Davis the choice of remittitur to the amount prescribed by the statute, or a new trial.

Indeed, the district court apparently recognized that it could have charged the jury to limit its award to the statutory maximum, for in its discussion with counsel regarding the verdict, the court stated:

I probably should have explained to counsel, but this is what I thought from before, that is why I said I will not tell them in my instructions what the statutory limit was, because it is something that we could always rectify. If the statutory limit is there, it cannot be exceeded.

(A.517.)

**13.** The notion that the jury guarded against biased judges was not unique to colonial America. Indeed, Blackstone noted:

The impartial administration of justice, which secures both our persons and our properties, is the great end of civil society. But if that be entirely entrusted to the magistracy, a select body of men, usually chosen by the prince, or by parties holding the highest offices in the state, their decisions, will frequently have an involuntary bias towards those of their own rank and dignity; .... It is therefore wisely ordered, that the principles and axioms of law, which are general propositions, flowing from reason, and not accommodated to times or to men, should be deposited in the breasts of the judges.... For here partiality can have little scope; .... But in settling and adjusting a question of fact, when entrusted to any single magistrate, partiality and injustice have an ample field to range in, either by boldly asserting that to be proved which is not so, or by more artfully suppressing some circumstances, stretching and warping others, and distinguishing away the remainder.

Here therefore a competent number of sensible and upright jurymen, chosen by lot from among those of the middle rank, will be found the best investigators of truth, and the surest guardians of public justice.

*Blackstone's Commentaries on the Law,* 689–690 (B. Gavit ed. 1941).

The Representatives of the people may be safely trusted in this matter.

Mr. Gerry [Massachusetts] urged the necessity of Juries to guard [against] corrupt Judges. He proposed that the Committee last appointed should be directed to provide a clause for securing the trial by Juries.

Col. Mason [Virginia] perceived the difficulty mentioned by Mr. Gorham. The jury cases cannot be specified. A general principle laid down on this and some other points would be sufficient. . . .

*Id.* at 293 (*quoting,* J. Madison, *Debates in the Federal Convention,* in 2 *Records of the Federal Convention of 1787,* 587 (M. Farrand ed. 1937)). While the proposal was ultimately defeated, apparently on the grounds that it would be difficult to accommodate the diverse practices of the several states in the federal constitution, *id.* at 294, Mr. Gerry's statement does seem to indicate that protecting against the abuse of *judicial,* as distinct from *legislative,* power underlay the framer's understanding of the right to a jury trial.

This position is lent further support by Alexander Hamilton's writings in Federalist No. 83, where after arguing that the right to a jury would have no effect in checking a legislature which had oppressively exercised its power of taxation, went on to state that: "The strongest argument in its favour is, that it is a security against corruption." The Federalist No. 83, at 563 (J. Cooke ed. 1961).

Thomas Jefferson expressed similar sentiments to those of Hamilton when he wrote

. . . JURIES therefore . . . determine all matters of fact, leaving to the permanent judges to decide the law resulting from those facts. But we all know that permanent judges acquire an Esprit de corps, that being known they are liable to be tempted by bribery, that they are misled by favor, by relationship, by a spirit of party, by a devotion to the Executive or Legislative; that it is better to leave a cause to the decision of cross and pile, than to that of a judge biassed to one side; and that the opinion of 12 honest jurymen gives still a better hope of right, than cross and pile does.

Thomas Jefferson to the Abbe Arnoux, July 19, 1789 (*reprinted in* 5 Kurland & Lerner, *The Founder's Constitution* 364 (1986)).[14]

The history of the Seventh Amendment as we have noted previously with reference to the second clause which is at issue here, is exceedingly sparse. We know that civil juries were provided for in the first clause of the Seventh Amendment ostensibly to protect against biased or corrupt judges. Indeed, the prescription that juries be "finders of fact" is consistent with the fear which finds expression in the writings of Hamilton and Jefferson noted above, that judges in 18th century England were perceived as not without partisan bias.

By the same token, once facts had been found by a jury, the framers of the second clause of the Seventh Amendment provided for further protection from a biased judiciary by decreeing that such jury factfinding must be final. Indeed this is not surprising given the unhappy experience in England with the well known abuses of the Court of Star Chamber. As one historian noted:

If a verdict had gone against the prosecution in a matter of moment, the jurors must have laid their account with appearing before the Star Chamber; lucky if they should escape, on humble retractation, with sharp words, instead of enormous fines and indefinite imprisonment. The control of this arbitrary tribunal bound down and rendered impotent all the minor jurisdictions. That primeval institution, those inquests by twelve true men, the unadulterated voice of the people, responsible alone to God and their conscience, which should have been heard in the sanctuaries of justice, as fountains springing fresh from the lap of earth, became, like waters constrained in

**14.** The phrase "cross and pile" refers to the two sides of a coin, i.e. "heads and tails." Brewer's

Dictionary of Phrase & Fable 253.

their course by art, stagnant and impure. Until this weight that hung upon the Constitution should be taken off, there was literally no prospect of enjoying with security those civil privileges which it held forth.

Hallam, *The Constitutional History of England,* 139 (1847) (footnote omitted). *See also Cohen v. Hurley,* 366 U.S. 117, 139–40, 81 S.Ct. 954, 967, 6 L.Ed.2d 156 (1961) (Black, J., dissenting) (quoting the passage above, and noting that the Star Chamber's willingness to make "short shrift" of jurors was among the abuses which "led first to the colonization of this country, later to the war that won its independence, and, finally to the Bill of Rights.")

We are sensitive to the notion that it is often difficult to draw conclusive determinations from historical evidence in addressing a contemporary question of constitutional interpretation, *see* Nelson, *History and Neutrality in Constitutional Adjudication,* 72 Va.L.Rev. 1237, 1282 (1986). Our historical discussion is put forward only to emphasize our primary holding, based on a textual analysis of the unambiguous terms found in the second clause of the Seventh Amendment. *See e.g. Davis v. Michigan Dept. of Treasury,* — U.S. —, 109 S.Ct. 1500, 1504 n. 3, 103 L.Ed.2d 891 (1989) ("Legislative history is irrelevant to the interpretation of an unambiguous statute.") We nevertheless find it instructive that prior to the actual drafting of the Seventh Amendment, a fundamental component of the right to a jury trial was the notion that it was the jury which was perceived as a guard against judicial bias, thus giving rise to the Seventh Amendment proscription against the Court "reexamining" any fact found by a jury.

### C.

In construing the Seventh Amendment's second clause as we have, we have attempted to give meaning to the precise language of the Amendment. In doing so, we are satisfied that we have done no violence to the framers' principle that judges, and judges only, are precluded from reexam-

ining facts tried by a jury. Where it is the legislature which has made a rational policy decision in the public interest, as contrasted with a judicial decision which affects only the parties before it, it cannot be said that such a legislative enactment offends either the terms, the policy or the purpose of the Seventh Amendment.

With these concepts in mind we are satisfied that the district court did not err when it rejected Davis' Seventh Amendment challenge even though the reasons assigned by the district court for doing so are not the reasons to which we subscribe.

### III.

A number of arguments primarily focused on evidentiary and trial errors have been advanced by the Doctor in support of his claim that the judgment of the district court should be reversed. In addition, the Doctor contends that the verdict must be reduced even further to comply with the now amended "cap" statute and because it is excessive. We now turn to these arguments.

### IV.

■ A primary argument by the Doctor is that plaintiff's expert testified to claims at trial different from those which were submitted to the Virgin Islands Malpractice Review Committee. Underlying this claim, and virtually all of the other evidentiary and trial assertions of error, which the Doctor makes is the Doctor's argument that the expert's report submitted by Davis was inadequate. We discuss that report in greater detail when we address the Doctor's argument that there was insufficient evidence to support the jury's verdict.

It is sufficient to note here that in the absence of a motion to strike that affidavit or in the absence of an objection to its admission into evidence, the Doctor must convince us that despite his failure to preserve this issue for appeal we should nevertheless take into account the deficiencies of that affidavit. We are not persuaded that the trial court's rulings constitute plain error. Accordingly, our review of the evi-

dence in connection with this particular argument cannot exclude consideration of the testimony given by Davis' expert.

Section 166i(b) of Title 27 of the Virgin Islands Code requires that before filing a malpractice complaint, a plaintiff must submit a copy of the complaint to the Virgin Islands Malpractice Review Committee ("Committee"). The statute provides, in relevant part:

> No action against a health care provider may be commenced in court before the claimant's proposed complaint has been filed with the Committee and the Committee has received the expert opinion as required by this section....

*Id.* The expert opinion called for in the statute is obtained at the Committee's expense. The Committee cannot prevent an individual from ultimately filing a lawsuit.

We have addressed this statute previously in *Berry v. Curreri*, 837 F.2d 623 (3d Cir.1988). The plaintiff, in *Berry*, submitted a proposed complaint to the Committee which alleged that her doctor had misdiagnosed a recto-vaginal fistula. However, at trial, in addition to her complaint of misdiagnosis of the recto-vaginal fistula, the plaintiff also sought to prove that her doctor had committed malpractice when he performed an earlier abdominal hysterectomy upon her. Over the objection of the defendant doctor, the district court permitted the introduction into evidence of the abdominal hysterectomy and submitted to the jury the claims of malpractice associated not only with the fistula diagnosis, but with the hysterectomy operation as well.

This court reversed. We held that § 166i(b) required that for any medical malpractice claim to be brought in the District Court of the Virgin Islands, the plaintiff must first submit that claim to the Malpractice Review Committee. Because Berry's complaint before the Committee did not include a claim for malpractice involving the hysterectomy performed on the plaintiff, we held that this claim was beyond the subject matter of the district court. *Berry*, 837 F.2d at 626. In the instant case, the Doctor argues that the district court has made the same error as

that which required reversal in *Berry*. We do not agree.

Davis' complaint before the Committee, not surprisingly, was identical to the complaint Davis filed with the district court. The statute requires that the complainant's *proposed* complaint to be filed with the district court also be filed with the Committee. Davis complied with that instruction.

A comparison of her Committee complaint (A. 519–23) and her district court complaint (A. 524–29) reveals no difference. Both complaints charge malpractice on the part of the Doctor, negligence, carelessness, and a failure to inform Davis of all material facts necessary for her to intelligently give informed consent to her surgery. Moreover, unlike the situation in *Berry* where two different episodes involving two different medical problems were involved, here the only surgery and the only malpractice charged had to do with Davis' knee. Indeed, in its charge to the jury, the district court instructed that a verdict could be returned in favor of Davis and against the Doctor only on the grounds of negligence/malpractice and malpractice caused by the failure to obtain Davis' informed consent. Thus, the case before us does not present a variance between the claims submitted for review by the Committee and the claims submitted to the jury—a circumstance which was present in *Berry*.

## V.

The Doctor argues that there was insufficient evidence to support the jury's verdict. Davis contends that the Doctor did not preserve this issue because the Doctor failed to raise it before the district court. Davis is correct in stating that the Doctor did not specifically argue the sufficiency of the evidence in any of the seven points raised in his motion for a judgment notwithstanding the verdict or a new trial. (A. 549–81). However, the Doctor did at least refer to a lack of evidence in his memorandum accompanying his motion for a JNOV. There the Doctor urged the court to grant a JNOV on insufficiency

grounds.[15] (A. 580). Moreover, the Doctor did raise insufficiency of evidence in his Motion for a Directed Verdict made at the close of Davis' case. The district court in addressing the Doctor's motion, did not explicitly find that there was sufficient evidence to support the jury's verdict. However, the district court did analyze the evidence in addressing the other arguments that the Doctor put forward.

We are reluctant to hold that the issue was preserved in light of the Doctor's failure to identify adequately and address that issue before the district court. Nevertheless, we need not rest our disposition of this argument on the ground of failure to preserve this issue because our independent review of the record discloses sufficient evidence to support the jury's verdict.

It is not disputed that the consent form, which Davis signed, only informed Davis of "Arthroscopy and excision of mass right knee and possible arthrotomy." The Doctor concedes that he removed cartilage and that he scraped and drilled the bone—procedures which were not detailed on the consent form.

Davis herself testified that the Doctor informed her he would do no more than "make two little holes in [my] knee." (A. 211). She claimed to have said to the doctor "if there is any cutting I am going to cancel it." (A. 212). The Doctor's response was claimed to be "Miss Davis, there will be no cutting. I guarantee you there is no need for cutting." *Id.*

The Doctor, on the other hand testified:

A. After I examined her in the cubicle in the hospital, I explained to her that what I think is probably wrong with her is she had a torn meniscus, and that is the reason why she is suffering that pain, and that is why, why she—I mean, she was limping, and that is the reason why the knee was locking up on her.

And I told her, to be able to diagnose this pain fully, you would need to have an arthroscopic examination done, and if this is found to be true, the knee will need to be opened up to take the torn meniscus out.

This was fully explained to her.

Q. Did Mrs. Davis at any time indicate to you that she did not want to have the knee cut?

A. No, she did not tell me....

\* \* \* \* \* \*

Q. Did Mrs. Davis at any time ever indicate to you that she did not want her knee to be cut under any circumstances?

A. No, she did not tell me.

This testimony, without more, provides sufficient evidence for the issue of informed consent to have been given to the jury. It was for the jury to determine which of the two versions it found credible and believed. In coming to this determination, the jury also had before it all of the other evidence introduced at trial as to Davis' ability to understand and comprehend the consent form which she signed and the circumstances surrounding her signature. In addition, Davis' expert testified that the Doctor had a duty to inform Davis of her options, possibilities, and risks in a way that was intelligible to her and that in this case the Doctor's efforts to inform Davis fell below the required standard of care.

The Doctor challenges this expert testimony as being "subjective." He supports his argument that "subjective" expert testimony is insufficient to support a jury's verdict by citing to *In re Paoli Railroad Yard PCB Litigation*, 706 F.Supp. 358 (E.D.Pa.1988) (Kelly, J.). That case, however, differs from the situation that is presented here. *Paoli* involved expert testimony with respect to the chemical PCB, which the plaintiffs claimed caused them

---

**15.** In the Doctor's motion for JNOV, a new trial, or remittitur, the following appears under the heading "Conclusion:"

Based on the evidence properly admitted at trial and excludable evidence improperly admitted at trial, Defendant is entitled to Judgment Notwithstanding the Verdict on the ba-

sis of the insufficiency of properly admitted evidence to support a verdict against the Defendant as presented in the proposed Complaint to the Medical Malpractice Review Committee under Virgin Islands law. (A.580).

injury. Expert opinions were filed by both plaintiffs and defendants in support of, and in response to, the defendants' summary judgment motion. The district court, in characterizing the plaintiffs' expert's opinions as subjective, ruled that they were not admissible and granted summary judgment for the defendants.

We are not persuaded that *Paoli* is helpful to our disposition of this appeal. First, *Paoli* was decided in a summary judgment context, not in a jury trial as was the present case. Second, our attention has not been called to any objection registered by the Doctor to the testimony given by Davis' expert. Third, and most important, even without the testimony of Davis' expert, our independent reading of the record satisfies us that the evidence, a portion of which has been recited above, was sufficient to support a verdict against the Doctor.

### A.

■ The Doctor also complains that much of Davis' expert testimony was not embraced within his expert "report" which was furnished to the Doctor in the form of an affidavit. At pre-trial, the magistrate had ordered Davis to furnish to the Doctor her expert's report with respect to the issue of professional malpractice. The entire report reads as follows:

I, JOSE SUAREZ CASTRO, having been duly sworn, depose and say:

1. I am a married adult resident of the Commonwealth of Puerto Rico, and I am a duly licensed physician and surgeon specializing in orthopedics.

2. My curriculum vitae is attached hereto, as Exhibit "A", and made a part hereof.

3. I am personally acquainted with Mrs. Theresa Davis, who is a plaintiff in the above-entitled case, and who has been my patient in connection with a knee problem she has had since 1984.

4. The plaintiffs have requested me, and I have agree to testify on their behalf in this case with respect to the standard of professional care to which Mrs. Davis should have received from Dr. Omitowoju in July, 1984, and with respect to the results of his acts and omissions.

5. Dr. Omitowoju had a duty to inform Mrs. Davis in clear and understandable terms what a reasonably prudent orthopedic specialist would tell a person of ordinary understanding with respect to the nature of his proposed course of therapy, and the risks and possibilities of harm which could occur so that her choice could be an intelligent one based upon sufficient knowledge to allow her to balance the possible risks against the possible benefits. Furthermore, Dr. Omitowoju had a duty to abide by and respect Mrs. Davis' decision as to the nature and extent of the treatment she would consent to.

6. Based upon my interview with Ms. Davis, my examination of her knee, my review of Mrs. Davis is [sic] medical records, I have formed the opinion that Dr. Omitowoju's acts and omissions fell below the standard of care in that he failed to obtain Mrs. Davis' informed consent for all of the surgical procedures he performed. It is further my opinion that the on-going complications and problems Mrs. Davis has been, and will continue to suffer directly result from Dr. Omitowoju's failure to obtain her informed consent.

DATED: 4/18/88

/s/Jose Suarez Castro

JOSE SUAREZ CASTRO, M.D.

As previously observed, the Doctor has not directed us to where in the record he objected to either the report or to any related testimony. Our own review of the record reveals that no contemporaneous objections were made by the Doctor. Nor does the record disclose that the Doctor objected to the "report" affidavit itself or moved to strike the "report" affidavit. Our reading of the testimony of Davis' expert leads us to conclude that the Doctor preferred attacking the merits of the "report" rather than objecting to the "report" or moving to have it stricken, because it was not the type of report envisaged by the pretrial order or Fed.R.Civ.P. 26(b)(4).

We therefore must review the Doctor's arguments under a plain error standard and conclude that plain error was not committed. If the Doctor had objected to the testimony or to the "report" affidavit, or if he had moved to strike the "report" and the testimony, or if he had refused to proceed until a complete and adequate statement from Davis' expert witness had been provided, a different situation on appeal might be presented. Indeed, had he objected before the district court or sought to strike the affidavit before that court, the district court itself may have ruled in his favor, and no issue concerning the "report" would then have survived. However, no such objection or motion was made. Having adopted the strategy of challenging the "report" on the merits and thus proceeding with the trial, the Doctor is in no position now to complain that the trial was manifestly unfair.

## VI.

■ The Doctor argues that the jury should have been instructed that no violation of the duty to obtain informed consent occurred if once Davis had been apprised of all the risks, a reasonable person would have gone ahead with the operation. The district court rejected this "reasonable person" standard and instead used a "particular person" standard, in this case, the particular person being Davis. (A. 375, 498–502).

■ Davis argues that the Doctor has not preserved this issue. Davis notes that the Doctor never formally objected to the district court's proposed instruction at the charging conference nor did he object after the instruction was read to the jury. Davis also calls attention to the fact that a "reasonable person" instruction was not included in the Doctor's proposed points for charge. We note, however, that there was considerable discussion at the charging conference on this issue, and that the Doctor did make his position clear but the district court rejected it. We will thus consider this issue as having been adequately preserved.

The district court rejected the Doctor's position on the grounds that it was inconsistent with the Restatement, which provides the substance of Virgin Islands tort law. The district court was correct. Indeed the illustration provided in Restatement of Torts, 2d § 53 [16] is remarkably similar to the instant case and employs a "subjective" standard.

> 3. B Consents to an exploratory operation, but either expressly refuses to have any further operation performed or does not give consent to its performance. While B is under ether, A discovers a condition which indicates the need of an operation. He proceeds to operate. A is subject to liability to B even though the operation is properly and successfully performed.

Given this clear indication by the Restatement that it is to the conduct of the patient that we must look, we cannot hold

---

16. The Restatement provides three relevant rules which bear on this issue:

§ 52. Consent: To Whom Given

The rule stated in § 892A as to the person to whose conduct must be given applies to intentional invasions of interests of personality.

§ 53. Consent to Particular Conduct

The rule stated in § 892A(2) as to consent to the particular conduct applies to intentional invasions of interests of personality.

Section 892A establishes the effect of consent, and it provides:

§ 892A. Effect of Consent

(1) One who effectively consents to conduct of another intended to invade his interests cannot recover in an action of tort for the conduct or for harm resulting from it.

(2) To be effective, consent must be

(a) by one who has the capacity to consent or by a person empowered to consent for him, and

(b) to the particular conduct, or to substantially the same conduct.

(3) Conditional consent or consent restricted as to time, area or in other respects is effective only within the limits of the condition or restriction.

(4) If the actor exceeds the consent, it is not effective for the excess.

(5) Upon termination of consent its effectiveness is terminated, except as it may have become irrevocable by contract or otherwise, or except as its terms may include, expressly or by implication, a privilege to continue to act.

that the district court erred in its instruction.

## VII.

■ The Doctor argues that the district court erred in not applying the amended version of the cap statute when reducing the jury's verdict in this case. Davis' claim arose in July 1984. She filed her complaint with the Malpractice Review Committee in December 1985, and with the district court in March 1986. 27 V.I.C. § 166b was amended in June 1986. The amendment limits a plaintiff's total recovery to $250,-000 and further limits any non-economic damages to $75,000.

The Doctor argues that some provisions of the new statute were passed with a "savings clause" which specifically limited the application of those provisions of the amended statute to actions arising after the amendment's effective date. The Doctor notes that no such savings clause was enacted with respect to the amendments involving the total amount of damages which could be awarded. He therefore concluded and argued that the new cap limitations should apply to all actions pending at the time the amended statute became law.

Davis responds citing general principles of statutory construction that retroactive application of statutes should be avoided unless required by the legislature. The Doctor, however, points to cases like *Board of Education of East Windsor v. Diamond*, 808 F.2d 987, 995–96 (3d Cir.1986) which states: "It has long been settled, however, that appellate courts are required to apply the law announced in subsequently enacted federal statutes." *Id.* (*citing Carpenter v. Wabash Ry. Co.*, 309 U.S. 23, 27, 60 S.Ct. 416, 418, 84 L.Ed. 558 (1940); *United States v. Schooner Peggy*, 5 U.S. 103, 2 L.Ed. 49 (1801)).

The district court adopted Davis' position noting that the amendments to the statute did not change the original "savings clause" of the whole Malpractice Act, 27 V.I.C. § 166*l*, which states "The provisions of this subchapter do not apply to any act of malpractice which occurred before the effective date of this subchapter."

We agree with Davis and the district court that the canon that statutes operate prospectively, requires the application of the 1975 version of 27 V.I.C. § 166b to this case. The Supreme Court, in addressing the issue of whether to apply a statute prospectively or retroactively, in *United States v. Security Industrial Bank*, 459 U.S. 70, 79–80, 103 S.Ct. 407, 413, 74 L.Ed.2d 235 (1982), stated:

The principle that statutes operate only prospectively, while judicial decisions operate retrospectively, is familiar to every law student. Compare 1 C. Sands, Sutherland on Statutory Construction § 1.06 (4th ed. 1972), with *Linkletter v. Walker*, 381 U.S. 618, 622–625 [85 S.Ct. 1731, 1733–1735, 14 L.Ed.2d 601] (1965). This Court has often pointed out:

"[T]he first rule of construction is that legislation must be considered as addressed to the future, not the past.... The rule has been expressed in varying degrees of strength but always of one import, that a retrospective operation will not be given to a statute which interferes with antecedent rights.... unless such be 'the unequivocal and inflexible import of the terms, and the manifest intention of the legislature.'" *Union Pacific R. Co. v. Laramie Stock Yards Co.*, 231 U.S. 190, 199, 34 S.Ct. 101, 102, 58 L.Ed. 179 (1913) (citations omitted).

*See, e.g., United States Fidelity & Guaranty Co. v. United States ex rel. Struthers Wells Co.*, 209 U.S. 306, 314, 28 S.Ct. 537, 539, 52 L.Ed. 804 (1908) ("The presumption is very strong that a statute was not meant to act retrospectively, and it ought never to receive such a construction if it is susceptible of any other"); *United States v. Schooner Peggy*, 1 Cranch 103, 110, 2 L.Ed. 49 (1801). We have noted that this rule "has generally been applied only when application of the new law would affect rights or obligations existing prior to the change in law." *Bon-*

*jorno v. Kaiser Aluminum & Chemical Corp.,* 865 F.2d 566, 573 (3d Cir.1989).

In the instant case, Davis chose to seek the Doctor's services at the time when her recovery for any malpractice which might have ensued was limited by the 1975 statute. Thus the rights and obligations of the parties in this case were predicated upon the 1975 statute. In light of 27 V.I.C. § 166*l*, and our foregoing analysis of retroactivity as well as the absence of any clear legislative indication to the contrary, we agree with the district court that the 1975 cap statute was applicable in this case.

### VIII.

 The Doctor, relying on *Williams v. Martin Marietta Alumina, Inc.,* 817 F.2d 1030 (3d Cir.1987), asks this court to reduce Davis' verdict claiming that even the capped verdict included an excessive award for pain and suffering. In *Williams,* the jury awarded the plaintiff $300,000 in pain and suffering for what in essence was a bad back. This court reduced it to $100,-000 stating that the award was "grossly excessive." This case, however, provides a much more compelling record than *Williams.*

Davis has undergone three subsequent knee operations. She has been on crutches for four years now. The testimony at trial indicated that if she is to regain significant motor function she will be obliged to undergo surgery for a complete knee replacement. Her pain and suffering award as capped was $250,000. We cannot say that such an award is "grossly excessive."

### IX.

The Doctor calls our attention to a duplication in the calculation of damages. He contends that the sum of $34,754 representing Davis' claimed past accrued economic losses were added twice in the district court's calculation. He explains this circumstance as follows:

> The trial court's Judgment recorded June 18, 1988 included a specific figure for past economic lost [sic] of $34,754.00. This figure was erroneously included giv-en the fact that Plaintiff's expert, Dr. Posner, submitted [testimony which] clearly establishes $34,754.00 was included in iis initial total economic loss figure of $101,133.00 adopted by the Court as the "alternative" available to the Plaintiff given her duty to mitigate (App. 589). Accordingly, an apparent miscalculation occurred and the Judgment of the Court relevant to this Motion should have been amended to delete the "double payment" of the $34,754.00 for past accrued economic losses. The court below never corrected the error (App. 598).

Br. of Appellant at 34 n. 7. Davis concedes that the district court erred by including the sum of $34,754 twice in calculating her total economic loss.

In light of Davis' concession and the record, we are obliged to vacate the district court's judgment appealed at 88–3754 and remand to the district court for the entry of judgment corrected to reflect the duplication of $34,754.

### X.

We will affirm the order of the district court dated October 26, 1988, which rejected Davis' constitutional challenge to the capped verdict and which Davis appeals at 88–3802.

We will vacate and remand the judgment of the district court awarding Davis $403,-294.92, which the Doctor appeals at 88–3754, but only for the purpose of having the district court enter a corrected judgment reflecting the subtraction of $34,754 as a duplication of the amount of past accrued economic loss (see part IX, above).

Each party will bear its own costs.